*********** EVIDENTIARY MATTERS
At the hearing before the Deputy Commissioner, plaintiff submitted the following:
a. A Copy of the North Carolina Department of Labor's Occupational Safety and Health file regarding Jake Taylor Farms which had been redacted pursuant to N.C. Gen. Stat. § 95-136(e), which was admitted into the record over defendants' objection, and marked as plaintiff's Exhibit (1);
b. An Industrial Commission Form 19, which was admitted into the record, and marked as plaintiff's Exhibit (2);
c. A photocopy of photographs of the decedent and family, which was admitted into the record, and marked as plaintiff's Exhibit (3);
d. A copy of the North Carolina Department of Labor's Occupational Safety and Health file regarding Jake Taylor Farms which had been redacted to a lesser extent than plaintiff's Exhibit (1) pursuant to N.C. Gen. Stat. § 95-136(e), which was admitted into the record over defendants' objection, and marked as plaintiff's Exhibit (4);
e. Department of Labor Safety Bulletins, which were admitted into the record over defendants' objection, and marked as collectively plaintiff's Exhibit (5);
f. Defendants' Amended Responses to Plaintiff's Interrogatories, which were admitted into the record, and marked as plaintiff's Exhibit (6), and;
g. Decedent's Time Sheets, which were admitted into the record, and marked collectively as plaintiff's Exhibit (7).
Also at the hearing before the Deputy Commissioner, defendants submitted plaintiff's Answers to Defendants' Interrogatories, which were admitted into the record, and marked collectively as Defendants' Exhibit (1), and a Map of the Area In Question, which was admitted into the record over plaintiff's objection, and marked as defendants' Exhibit (2).
Subsequent to the hearing before the Deputy Commissioner, and following submission of briefs by the parties, the Deputy Commissioner filed an Order on November 27, 2002, denying plaintiff's motion, and ruling that the Industrial Commission did not have jurisdiction pursuant to N.C. Gen. Stat. § 95-136(e) to Order the Commissioner of Labor, in the exercise of her discretion, to turn over unredacted information in the Department of Labor's Occupational Safety and Health file regarding Jake Taylor Farms.
Also regarding the Department of Labor's Occupational Safety and Health file and a narrative report by an OSHA Investigator, Everett Puckett, defendants' objection to his testimony about said report on hearsay grounds was overruled, the report having been generated in the regular course of business of the Department of Labor.
The Full Commission finds the actions of the Deputy Commissioner with respect to these evidentiary matters were proper and therefore sustained.
 ***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Houser and the briefs and arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence or to amend the prior Opinion and Award, except for minor modifications. The Full Commission therefore affirms the Opinion and Award of the Deputy Commissioner with minor modifications.
 ***********
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement that was admitted into the record and marked as Stipulated Exhibit (1):
 STIPULATIONS
1. At the time of the injury that gave rise to this claim, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At such time, an employment relationship existed between the deceased plaintiff-employee, hereinafter the "decedent", and Jake Taylor Farms.
3. At all relevant times herein, Jake Taylor Farms was insured, with Dennis Insurance Group on the risk.
4. At the hearing before the Deputy Commissioner, the parties submitted a packet of records and Industrial Commission forms, which was admitted into the record and marked as Stipulated Exhibit (2). Subsequent to the hearing before the Deputy Commissioner, upon order of the Deputy Commissioner, a packet of wage records of Jake Taylor Farms' employees was submitted, admitted into the record, and marked as Stipulated Exhibit (3).
5. The issues to be determined are as follows:
a. Whether decedent died in the course of and out of his employment with the Jake Taylor Farms;
b. Whether a presumption of compensability established in Pickrell v.Motor Convoy, Inc., 322 N.C. 363, 368 S.E.2d 582 (1988), arises in the circumstances of this case;
c. What, if any, benefits are the decedent's widow and five (5) children due under N.C. Gen. Stat. §§ 97-38, 97-39, and 97-40;
d. If the decedents' dependents and his estate are entitled to any indemnification under the Act, whether those benefits should be increased by ten-percent (10%) pursuant to N.C. Gen. Stat. § 97-12 based upon causal relationship between the defendant employer's willful failure to comply with the OSHA regulations and the death of decedent;
e. Whether an administratix can make claim for benefits when the decedent's certificate of death indicates that he died on July 6, 2001 and June 26, 2001, was the date he was last employed by Jake Taylor Farms; and
f. Whether the Pickrell presumption applies to a deceased employee whose death certificate indicates that he died on July 6, 2001 and his last day of work was June 26, 2001 and his remains were found on property not owned or rented by the employer defendant.
 ***********
Based upon all of the competent evidence of record and the reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACTS
1. At the hearing before the Deputy Commissioner, Luis Ramirez-Miranda, decedent's brother, who does not speak English, testified through an interpreter, Ms. Lucia A. Wilberding, who was duly sworn in that capacity.
2. Urbano Ramirez-Miranda, the decedent, was at all times relevant to this claim, a resident of Halifax County, North Carolina. He was born on June 16, 1967, in Guerrero, Mexico. As of the date of his death, the decedent was married to Zoila Cortes-Aguilar, and the couple had five children, Gloria Ramirez-Cortes, Juan Manuel Ramirez-Cortes, Francisco Ramirez — Cortes, Isaac Ramirez-Cortes, and Antonio Ramirez-Cortes. The decedent's widow and five children continued to live in Guerrero, Mexico, as of the time of the hearing before the Deputy Commissioner.
3. On Sunday, June 24, 2001, decedent arrived at the Jake Taylor Farms' migrant labor camp looking for work. At that time, decedent used false identification that identified him as Luiz Ortega. Decedent met that day with Angel Hernandez, the camp supervisor, and was advised that he could begin working the following day, Monday, June 25, 2001. He worked all day Monday, June 25, 2001, without incident.
4. On Tuesday, June 26, 2001, decedent began working for Jake Taylor Farms harvesting pickle cucumbers at approximately 6:00 a.m. He and the other crew members picked cucumbers until approximately 10:00 a.m. During that time, the decedent harvested at least twenty-two buckets of cucumbers as evidenced from the cucumber tokens later found in his clothing.
5. Subsequent to harvesting cucumbers, the decedent and the other crew members went to another field and began harvesting tobacco. At some time after 10:00 a.m., the decedent approached Hernandez and informed him that he had a nosebleed. Hernandez told him to rest in the shade until the bleeding stopped. This evidence of the decedent's interactions with Hernandez is contained within the Department of Labor's Occupational Safety and Health file, and specifically comes from an interview Herndandez had with Everett Puckett, an investigator with the Department of Labor. This evidence also comes from Hernandez's testimony at the hearing before the Deputy Commissioner, in which he contradicts some of the details contained in Puckett's report. These contradictions or differences are found by the Full Commission to be of little relevance, other than to reflect adversely on Hernandez's overall credibility, with the most probative aspect of this evidence being decedent's physical condition on the date in question.
6. Following the crew's lunch break on June 26, 2001, Jake Taylor Farms transported the crew by bus from one tobacco field to a second one referred to as the KOA field. Crew members who were interviewed by Puckett and Hernandez verified that decedent was present on the bus as the crew was being transported from the first tobacco field to the KOA field. Puckett's report further indicates that a coworker last observed decedent working in the KOA field at approximately 3:00 or 4:00 p.m. on the date in question.
7. Later during the evening of June 26, 2001, after the crew had returned to its camp site, it was determined that the decedent was not present. Puckett's report reflects that decedent's co-workers began searching for the decedent at approximately 9:00 p.m. on June 26, 2001, but did not locate him.
8. Based upon Puckett's report, other workers who took part in the investigation conducted by the Department of Labor were intimidated while in the presence of Hernandez, their supervisor. However, as the report indicates, once Hernandez was separated from the crew members, they were more cooperative and forthcoming in the investigation.
9. Regarding the last time he could recall seeing the decedent on June 26, 2001, Hernandez indicated to Puckett that he last saw the decedent along a dirt path or row in the field moving toward a paved road that was adjacent to the field. Hernandez said he assumed decedent was quitting his employment with Jake Taylor Farms. However, Hernandez was not able to give any reason why he would assume decedent had quit his employment, and further testified that he had never heard the decedent express any complaint about his job or express any desire to quit. Through his testimony, Hernandez also attempted to portray the decedent, who had picked at least twenty-two buckets of cucumbers on the morning of June 26, 2001, as being a poor worker. However, he also admitted that he had never criticized the decedent at any time for the manner in which he was performing his work.
10. Based upon the totality of the credible evidence of record, the Full Commission places little weight on the portions of the testimony of Hernandez in which he contends that the decedent was a poor worker or that he had quit his employment with Jake Taylor Farms. In fact, the most reasonable inference that can be drawn from Hernandez's testimony is that it was designed to benefit Jake Taylor Farms' position in this matter, which would result in not having to pay benefits to the estate of an employee who had worked for it for only two days.
11. During the two days that the decedent worked for Jake Taylor Farms, he performed heavy physical labor in sunny conditions, with the temperature being 80 degrees Fahrenheit or higher, and at least eighty-seven (87) degrees Fahrenheit from approximately 11:00 a.m. until approximately 6:00 p.m. on June 26, 2001. During this period on the date in question, the humidity ranged from a low of fifty-five percent (55%) to a high of seventy-four percent (74%).
12. On July 6, 2001, the first day that Jake Taylor Farms' crew returned to harvest tobacco at the KOA field where decedent was last seen, a member of the crew walked from the field during the working day into a nearby wooded area to urinate, and discovered the remains of a body which was identified as the decedent. The body was located at a place from which it took approximately two minutes to walk from the edge of the KOA field.
13. During the course of his investigation of Jake Taylor Farms' compliance with OSHA requirements, Puckett learned that the migrant crew workers regularly used the woods in the vicinity of where the decedent's body was found as a toilet area. Puckett noted this fact as being consistent with what he personally observed during his investigation.
14. The credible evidence of record supports a finding that the decedent was working within the course and scope of his employment with Jake Taylor Farms in the KOA tobacco field at about 3:00 or 4:00 PM on June 26, 2001 when he was last seen by coworkers.
15. Although decedent's death certificate lists the date of death as being July 6, 2001, the date his badly decomposed body was discovered, Dr. Robert Zipf, a forensic pathologist and medical examiner, opined that based upon the autopsy he performed, the decedent could have died on June 26, 2001.
16. The Chief Medical Examiner for the State of North Carolina determined that the cause of decedent's death was unknown, and that the manner of his death was undetermined. In making those determinations, the Chief Medical Examiner accepted the findings of Dr. Zipf, and rejected that of the Halifax County Medical Examiner, Dr. Minielly. At the time that Dr. Minielly made his determination, he did not specialize in forensic pathology or pathology, and accordingly, his opinions are given less weigh than those of the Chief Medical Examiner for the State of North Carolina and Dr. Zipf.
17. In making his findings, Dr. Zipf found no evidence of any trauma leading to a cause of death, which would include such things as broken bones, fractures, or evidence of severe bleeding. In addition, because in part of the extensive decomposition of the internal organs, Dr. Zipf did not find any evidence that he could attribute to a natural disease that had caused the decedent's death. Additionally because of the extensive decomposition, Dr. Zipf did not have any opportunity to look for medical signs that would indicate that the decedent's death may have been caused or contributed to by heat stroke.
18. Based upon the totality of the credible evidence of record, including, but not limited to the testimony of Dr. Zipf and the date, location, and circumstances of the discovery of the decedent's body, the Full Commission finds that decedent died on June 26, 2001.
19. Based upon the credible evidence of record, decedent's unexplained death occurred while he was working within the course and scope of his employment with Jake Taylor Farms. The fact that his body was found on land not rented by Jake Taylor Farms but adjacent to such land is immaterial. Jake Taylor Farms employees regularly walked to the wooded area where decedent's body was found in order to attend to toilet needs.
20. Based upon the credible evidence of record, including the submitted Industrial Commission Form 22 wage chart, the decedent earned $50.00 per day during the two-day period he worked for Jake Taylor Farms. Based upon that daily amount, defendants contend that the decedent's average weekly wage would equal $250.00, which would yield a compensation rate of $166.75.
21. Defendants have also submitted a Form 22 that they contend should be used in determining the average weekly wage of a comparable employee. That Form reflects that such an employee earned an average of $50.00 per day.
22. During the 2001 farming season, Hernandez and Jake Taylor Farms' other migrant workers were employed for twenty-two consecutive weeks from the week ending April 27, 2001, to the week ending October 12, 2001. Typically, Hernandez and his crew members work with pickle cucumbers, tobacco, and sweet potatoes during the annual farming season with Jake Taylor Farms. In the 2001 farming season, Jake Taylor Farms employed at least eleven other employees each of these weeks. Those employees were Santiago Bautista, Anastacio De La Garza, Pablo Nava, Alberto Pascual, Damacio Rodriguez, Pablo V. Rodriguez, Rafael Rodriguez, Maylos Sanchez, Sabas Sanchez, and Benito Vidal. The highest average weekly wage for those employees was $339.12 for Benito Vidal. The lowest average weekly wage among that same group was $312.72 for Anastacio De La Cruz. The median average weekly wage for these employees was $315.76, which was earned by Sabas Sanchez.
23. Due to the length of the period the decedent worked for Jake Taylor Farms, the Full Commission finds that calculating his average weekly wage based upon the first method prescribed in N.C. Gen. Stat. § 97-2(5), his earnings over the fifty-two (52) week period prior to his death, would be unfair, and would not most nearly approximate the amount of wages decedent would have earned were it not for his death.
24. Because the maximum potential period of the decedent's employment with Jake Taylor Farms would be considerably less than fifty-two (52) weeks, and the period of employment of a comparable employee is also considerably less than fifty-two (52) weeks, the Full Commission finds that calculating the decedent's average weekly wage based upon the second, third, or fourth method prescribed in N.C. Gen. Stat. §97-2(5), would be unfair, and would not most nearly approximate the amount of wages decedent would have earned were it not for his death.
25. Based on the exceptional circumstances of this case, the Full Commission finds that the fifth method outlined in N.C. Gen. Stat. §97-2(5) is the only method which is fair to both parties and would result in a calculation of the decedent's average weekly wage that most nearly approximates the amount of wages he would have earned were it not for his death.
26. Considering all the factors at issue in this case, the Full Commission finds that it would be fair and just to all parties to use the median average weekly wage of the eleven (11) employees employed by Jake Taylor Farms during the 2001 farming season, which is $315.76. That average weekly wage yields a compensation rate of $210.61.
27. There is no evidence upon which to find that the decedent's death was caused by the willful failure of Jake Taylor Farms to comply with any statutory requirement.
 ***********
Based upon the foregoing findings of fact, Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Due to the length of the period the decedent worked for Jake Taylor Farms, the Full Commission concludes that calculating his average weekly wage based upon the first method prescribed in the Act would be unfair, and would not most nearly approximate the amount of wages decedent would have earned were it not for his death on or about June 26, 2001. N.C. Gen. Stat. § 97-2(5). Further, none of the other first four methods outlined in the Act will result in a fair calculation of decedent's average weekly wage. Id.
2. Based on the exceptional circumstances of this case, the Full Commission concludes that the fifth method outlined in the Act is the only method which is fair and would result in a calculation of the decedent's average weekly wage that most nearly approximates the amount of wages he would have earned were it not for his death on or about June 26, 2001. N.C. Gen. Stat. § 97-2(5). Considering all the factors at issue in this case, the Full Commission concludes that it would be fair and just to all parties to use the median average weekly wage of the eleven employees employed by Jake Taylor Farms during the 2001 farming season, which is $315.76 and yields a compensation rate of $210.61. Id.
3. There is a rebuttable presumption that a death occurring within the course of employment is work-related when the medical reason for death is unknown. Pickrell v. Motor Convoy, Inc., 322 N.C. 363, 370 S.E.2d 582
(1988). Based upon the credible evidence of record and the reasonable inferences flowing therefrom, the Full Commission concludes that this is a case in which the Pickrell presumption properly applies and there is an insufficient basis upon which to rebut the Pickrell presumption in this case. Id.
4. As the widow of the decedent, Zoila Cortes-Aguilar is conclusively presumed to have been wholly dependent upon him for support at the time of his death. N.C. Gen. Stat. §§ 97-38; 97-39.
5. As the minor children of the decedent, Gloria Ramirez-Cortes, Juan Manuel Ramirez-Cortes, Francisco Ramirez — Cortes, Isaac Ramirez-Cortes, and Antonio Ramirez-Cortes are conclusively presumed to have been wholly dependent upon him for support at the time of his death. Id.
6. Given that the decedent's death occurred for a medically unknown reason during the course of employment with Jake Taylor Farms, the decedent's widow, Zoila Cortes-Aguilar, is entitled to a one-sixth share of compensation benefits based upon a compensation rate of $210.61 per week for a period of four-hundred (400) weeks from June 26, 2001. Id.
7. Given that the decedent's death occurred for a medically unknown reason during the course of employment with Jake Taylor Farms, each of his five minor children, by and through their Guardian Ad Litem, Ms. Helen Reyes-Bullock, for their use and benefit, are entitled to a one-sixth share of compensation benefits based upon a compensation rate of $210.61 per week for a period of four-hundred (400) weeks from June 26, 2001, or until they reach eighteen (18) years of age, whichever last occurs. Id.
8. Given that the decedent's death occurred for a medically unknown reason during the course of employment with Jake Taylor Farms, his estate is entitled to payment of burial expenses in the amount of $3,387.00. N.C. Gen. Stat. § 97-38.
9. There is no evidence upon which to conclude that the decedent's death was caused by the willful failure of Jake Taylor Farms to comply with any statutory requirement. N.C. Gen. Stat. §97-12.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay to Zoila Cortes-Aguilar a one-sixth share of compensation benefits based upon a compensation rate of $210.61 per week for a period of four-hundred (400) weeks from June 26, 2001. Such compensation that has accrued shall be paid to Mrs. Zoila Cortes-Aguilar in a lump sum. This compensation is subject to the attorney's fee approved herein.
2. Defendants shall pay to each of the decedent's five (5) minor children, by and through their Guardian Ad Litem Ms. Helen Reyes-Bullock, and for their use and benefit, a one-sixth share of compensation benefits based upon a compensation rate of $210.61 per week for a period of four-hundred (400) weeks from June 26, 2001, or until they reach eighteen (18) years of age, whichever last occurs. Such compensation which has accrued shall be paid for the children to theirGuardian Ad Litem Ms. Helen Reyes-Bullock in a lump sum. This compensation is subject to the attorney's fee approved herein.
3. Defendants shall pay interest at 8 percent per year on all sums due under paragraphs 1 and 2 of this award from the date of the hearing before the Deputy Commissioner, October 31, 2002, until paid.
4. Defendants shall pay to decedent's estate burial expenses in the amount of $3,387.00.
5. A reasonable attorney's fee of twenty-five percent (25%) of the compensation awarded herein is approved for counsel for decedent. From the compensation having accrued, this fee shall be deducted from the amounts due decedent and paid directly to counsel for decedent, with counsel for decedent receiving every fourth check thereafter.
6. Defendants shall pay the costs, including the cost of one copy of the transcript of the deposition of Dr. Zipf that was taken in this action.
This 12th day of November 2003.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
 S/_________________ PAMELA THORPE YOUNG COMMISSIONER